(No. 6736.   October 25, 1939.)

RICHARD H. JONES, Respondent, v. PACKER JOHN MINES CORPORATION and EARL CANTRELL, Employers, Appellants.

[95 Pac. (2d) 572.]

Hawley & Worthwine, for Appellant.

J. M. Lampert, for Respondent.

HOLDEN, J.—The Packer John Mines Corporation was formed in November, 1937, for the purpose of developing what is referred to in the record as the "Packer John" mines. In August of the following year the Packer John Mines Corporation, hereinafter called the "corporation," through its president and manager, C. Gordon Smith, entered into a written lease with J. C. Fattig and E. M. Murphy under the terms of which Fattig and Murphy were to furnish their own grub and the corporation was to furnish powder, tools and timber. The net lease proceeds were to be divided 50 per cent to the corporation and 50 per cent to the lessees. In addition to that written lease there were also oral leases to others on substantially the same terms, among them, Earl Cantrell.

On or about September 3, 1938, Cantrell, while in Boise, ran across claimant Richard H. Jones. At that time Jones was unemployed and had been so intermittently over a period of two years. A conversation took place between the two men, the evidence as to what was said being conflicting, but as a result Jones left Boise with Cantrell to go to the Silver Star mine where he worked without wages for about a week. They then moved to what is called the "Packer John" and began mining under the oral lease between Cantrell and the corporation. Jones, having had no previous mining experience, worked under the directions of Cantrell. At that time Jones knew nothing about the corporation. They worked in an open cut but later Cantrell decided the ore was not "running high enough" so they started to tunnel. Jones and Cantrell worked on the tunnel until mid-October. At that time returns were received on a shipment of a carload of ore mined by other lessees. The returns

were so poor that the other lessees abandoned their leases, and shortly thereafter Cantrell also abandoned his oral lease.

Following the abandonment of the leases, Smith, by letter, offered Cantrell (and about the same time made the same offer to the other leasers) ten tons of ore out of any place on the mining property, apparently to compensate them for time spent in mining the poor ore, to pay grocery bills incurred during that time, and to give them an opportunity to "get even," out of which ten tons of ore the company would make no claim whatsoever and receive none of the proceeds. The lessees to whom these respective gifts of ore were made were to furnish their own powder, fuses, caps and grub, but they could mine wherever they desired. Cantrell and Jones then moved onto the property covered by the Fattig and Murphy written lease but which had been abandoned by Fattig and Murphy. December 11, 1938, while mining on that property with Cantrell, Jones suffered a broken back and broken leg as the result of a cave-in. He was removed to the St. Alphonsus Hospital in Boise and a month later removed to the Ada County Hospital.

In February, 1939, about 100 sacks of the gift ore, mined by Jones and Cantrell, were shipped to a smelter in the name of Melvin Nebbs. Payment therefor was withheld until receipt of a "silver certificate" from the corporation. Upon the giving of the "silver certificate" by the corporation in compliance with the Silver Purchase Act of 1934 (secs. 448–448c, Title 31, U. S. C. A.), the smelter released the money for the gift ore. Nebbs then deducted his grocery bill (not incurred by or in behalf of the corporation) from the check received from the smelter and remitted the balance to Cantrell. Cantrell held out some $16 for himself and requested Nebbs to remit the remainder to Jones, at that time in the hospital.

March 7, 1939, Jones filed notice of injury and claim for compensation with the Industrial Accident Board. June 13, 1939, the matter was heard. June 30, 1939, the Board made findings of fact and rulings of law, and July 1, 1939, made and entered thereon an amended award against the corporation and Earl Cantrell, as employers. The appeal is from that award.

It is contended by appellant corporation it was formed for the purpose of developing the mining property from which the gift ore was taken by Cantrell and Jones and that the work done by them in mining that ore was not performed for the purpose of developing its property nor for its pecuniary gain. On the other hand, it is contended by claimant that appellant, under the provisions of section 43–1806, I. C. A., was "virtually the proprietor of the business there carried on"; hence appellant corporation was the "employer" within the meaning of that statute, and consequently, is liable to pay compensation.

Section 43–1806, *supra*, provides:

"'Employer,' unless otherwise stated, includes any body of persons, corporate or unincorporated, public or private, and the legal representative of a deceased employer. It includes the owner or lessee of premises, or other person who is virtually the proprietor or operator of the business there carried on, but who, by reason of there being an independent contractor, or for any other reason, is not the direct employer of the workmen there employed. If the employer is secured it includes his surety so far as applicable."

This court in *In re Fisk,* 40 Ida. 304, 307, 232 Pac. 569, adopted the construction of an identical statute by the supreme court of Vermont in *O'Boyle v. Parker Young Co.,* 95 Vt. 58, 112 Atl. 385, where that court said:

"It was the evident intention of the Legislature to make the person or persons, company or corporation, that for practical purposes was the proprietor or operator of the business being carried on, the employer, as the word is used in the statute, though not actually the employer of the workmen by reason, among others, of there being an independent contractor who was the direct employer. Under the provisions of the statute quoted, the true test is, Did the work being done pertain to the business, trade, or occupation of the defendant, carried on by it for pecuniary gain? If so, the fact that it was being done through the medium of an independent contractor would not relieve the defendant from liability."

The true test in the case at bar is, then, was appellant corporation virtually the operator of the business of mining

the ten tons of gift ore either for the development of the property or for its own pecuniary gain? The testimony on that question follows.

█ Claimant Jones testified:

"Q. Did you at any time hear Mr. Cantrell or anyone else discuss a proposition some time in November or December concerning or relating to Cantrell taking out ten tons of ore?

"A. Well, I think along about the first or around the first —it was in October Mr. Cantrell made a trip to Boise, and when he came back he said Mr. Smith told him he could have ten ton of the best ore any place he could get it."

" . . . .

"Q. Why did you leave the old property, the old tunnel where you had worked?

"A. Mr. Cantrell thought if we would go around where they were working he could get out some pretty good ore pretty quick.

"Q. Ten ton or more?

"A. Yes."

Melvin Nebbs, a witness for claimant Jones, testified:

"Q. Do you know what new arrangements was made with the Packer Mine—with Cantrell and the Packer Mine?

"A. No. Only what Mr. Cantrell told me.

"Q. What did he tell you?

"A. He said Gordon Smith was going to give him ten tons of ore for his work.

"Q. When you speak of Gordon Smith you are referring to him as President of the Packer John Mines Corporation and not as an individual? You dealt with him in his official capacity at all times as President of the Packer John?

"A. Yes.

"Q. Cantrell told you Smith or the Packer John had agreed to give him ten tons of ore?

"A. Yes."

" . . . .

"A. I was informed that Mr. Cantrell could mine any place he wanted to on the property to get his ten tons of high-grade ore.

"Q. Get that out for himself?

"A. Yes.

"Q. And he didn't have to pay the company anything for that?

"A. No."

"  . . . .

"Q. Would you know whether or not the Packer John had given the same privilege to the other leasers to take ten tons free, that they had given Cantrell?

"A. Yes.

"Q. And the other leasers had taken out ten tons apiece free?

"A. They only got 3 or 4 tons apiece altogether.

"Q. And the Packer John had no interest in that and got none of the money?

"A. No."

E. M. Murphy, also a witness for respondent, testified:

"Q. Do you know whether or not the claimant here had the same arrangement—the defendant, Mr. Cantrell had the same arrangement?

"A. He told me he had."

"  . . . .

"Q. How did you come to get that privilege of taking out that ten tons of ore?

"A. I rather think it was because it—because we owed for our grocery bill and it was a privilege granted us by the Packer John.

"Q. To give you an opportunity to get even?

"A. That is what I understood."

Earl Cantrell testified:

"Q. What happened in October?

"A. Well, they shipped that carload of ore and the carload of ore didn't bring in any money. It didn't go nothing like they thought it would go so Mr. Smith and I talked it over and we decided that I couldn't make the lease so he gave me ten ton of ore and I could take that anywhere on the property I wanted to, this ton of high-grade, any place I wanted to take it and so I quit the lease and went to work on that.

"Q. When was it you quit the lease you had and went to work on the ten ton of high-grade proposition?

"A. It was some time in October.

"Q. How long did you work on that ten-ton high-grade proposition?

"A. It was in December.

"Q. Did the Packer John Company or Mr. Smith personally have any interest whatever in that ten ton?

"A. No. They did not.

"Q. Were you to do anything or pay anything for the lease or for the ten ton?

"A. Not for the ten ton I wasn't to pay anything."

" . . . .

"A. Yes. I come down and told him (Jones) what Gordon Smith had offered me.

"Q. Who did you tell that to?

"A. Mr. Jones and I think Mr. Murphy and my son and Art Zimmerman. I believe I told all of them.

"Q. What did you tell them?

"A. I told them Gordon Smith had given me ten ton of ore and I could take it out any place there I could get it."

C. Gordon Smith, manager of appellant corporation, testified:

"A. . . . . And he (Cantrell) said it was foolishness to go on there. He said there was some high-grade there and wanted to know if he could take some of it. I said he could certainly have ten tons up there and if there wasn't more than ten tons of high-grade up there for each one of those leases I said we will never go ahead with it.

"Q. What arrangements were made then?

"A. I believe I wrote him (Cantrell) a letter at that time giving him permission to take ten tons of ore.

"Q. And did you and Cantrell come to any conclusion to end the oral lease?

"A. It was understood that was over; that came out definitely in the conversation.

"Q. What was this proposition as to the ten ton? Was that a new proposition?

"A. Yes, entirely.

"Q. What was it? What ground did it cover? What were either of you required to do? Give us a full statement of that new proposition.

"A. I told him we didn't want anything to do with it at all, and we didn't want to put up anything and if they could get some money to go ahead and take it, and I told Cantrell when I came to the mine.

"Q. Did you expect to get anything out of this new ten ton proposition either in the way of work or money?

"A. No.

"Q. Or development of your property?

"A. No."

"  . . . .

"Q. In developing a mining property of that kind is it beneficial to explore it and ascertain what, if any, ore is there?

"A. The form in which that question is fixed can only be answered, of course it is.

"Q. Can be answered how?

"A. Of course it is beneficial.

"Q. It is a benefit to develop and explore?

"A. Yes. But to just gouge out high-grade depletes the looks of the property.

"Q. From the standpoint of stock selling it may be injurious but from the standpoint of determining what you actually have there, a development of that kind is beneficial?

"A. I would not deny that little exploration was of material benefit."

The uncontradicted evidence establishes these facts: That all leases, including the Cantrell oral lease, had been abandoned before Jones was injured December 11, 1938; that after the abandonment of such leases the corporation made a gift of ten tons of ore to Cantrell and to the other leasers as well; that the gift ore could be mined at any place on the mining property selected by the leasers themselves and without any thought of the development or exploration of the mine; that the corporation was not to have and actually did not have any pecuniary interest whatever in the

gift ore; that it had no supervision or control over either Cantrell or Jones during the period they were mining the gift ore; that Cantrell told Jones upon his return to the mine from Boise Smith had told him (Cantrell) that "he could have ten ton of the best ore any place he could get it"; therefore, Jones knew of the gift of the ten tons of ore from Smith (acting for the corporation) to Cantrell, according to his own testimony. And knowing the ore was a gift, Jones well knew at the time he and Cantrell were mining the gift ore that they were mining it in an area which had already been explored, developed and high-grade ore uncovered; and that the gift ore was being mined solely for his own benefit and that of Cantrell.

It follows from what has been said the corporation was not virtually the operator of the business of mining the ten tons of gift ore either for the development of the property or for its own pecuniary gain.

The award of compensation against Earl Cantrell is affirmed, but the order awarding compensation against appellant Packer John Mines Corporation is reversed and the cause remanded with directions to the board to deny respondent's claim against it. No costs awarded.

Ailshie, C. J., and Budge, Givens and Morgan, JJ., concur.